[Crim. No. 13107. Second Dist., Div. One. Dec. 6, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. MICHAEL LOUIS LOVE, Defendant and Appellant.

 

Patrick Lynch, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Bruce Wm. Dodds, Deputy Attorney General, for Plaintiff and Respondent.

FOURT, J.—This is an appeal from a judgment of conviction of a violation of section 11500.5, Health and Safety Code (possession for sale of heroin).

In an information filed on March 3, 1965. in Los Angeles, defendant was charged with possessing heroin for sale on January 21, 1965. Defendant pleaded not guilty and in a jury trial was found guilty as charged. Criminal proceedings were adjourned at the instance of defendant and the sheriff was ordered to file a petition pursuant to secion 6451 of the Penal Code for the defendant to be examined and a determination made whether defendant was addicted to the use of narcotic drugs or was in imminent danger of becoming so addicted. Defendant was committed to the Department of Corrections. California Rehabilitation Center at Corona on or about June 1, 1965, and received at the center on June 4, 1965. On July 11, 1965, defendant escaped from the center. Several months later, on November 3, 1965, defendant was arrested by the police. He was in the apartment of a female parolee where the parole officer found a large amount of heroin.

Defendant, although placed under arrest at the apartment fled the scene and two days later was caught. Defendant was charged in case numbered 314368 (Superior Court, Los Angeles) with possession for sale of such heroin (found in the apartment) and pleaded guilty to such charge and was on

March 22, 1966, sentenced to the state prison. Apparently while awaiting disposition of the case (No. 314368) defendant escaped from jail and in the course thereof broke his leg. He was charged in case numbered 317203 (Superior Court, Los Angeles) with escape from jail while confined on a felony count and on March 3, 1966, pleaded guilty to such charge. The sentence in the escape charge was ordered to run concurrently with the sentence in case numbered 314368. Defendant was returned to court in the case at hand (No. 300732), the narcotics addiction petition was dismissed, and defendant was sentenced to the state prison on July 12, 1966, the term to be consecutive with any other term being served.

A résumé of some of the facts is as follows:

Officer Van Court, of the Los Angeles Police Department, a police officer of almost 18 years' experience, more than 10 of which had been in the narcotics division, and who had testified in matters having to do with narcotics on five to six hundred occasions properly qualified as an expert in the field of narcotics and narcotics transactions in the geographical area in which defendant operated. The officer related that the most common container used by heroin peddlers in handling, carrying and selling heroin is a small balloon. The peddler takes the stronger, or more pure, heroin and cuts, mixes and dilutes it with milk sugar or some other suitable substance to the end that the product sold by the peddler in the area in question is about 5 to 6 percent pure heroin. The heroin mixed with the powder is placed in small gelatin capsules and the capsules are then placed in a small balloon. This method of packaging is used for a number of reasons, for example, in order to preserve the heroin and to protect it from any moisture (as it is soluble in water), also because in the event a possessor of heroin is confronted with any law enforcement agent, he can readily swallow the small balloon containing the capsules and it will pass through his body and later can be recovered; further the package can quickly and easily be disposed of and can easily be carried in the mouth or flushed down a toilet in case of necessity. The officer expert also testified that the average addict in the valley area in question uses between two and three capsules per day and that anyone in possession of over 600 capsules of heroin in his opinion is a possessor for sale.

On January 21, 1965, Officer Van Court with Sergeant Mullins, two narcotics detectives, along with two burglary detectives went to the house where defendant was living on

Astoria Street in the Sylmar area of Los Angeles. The house is a single residence on a 150- x 60-foot lot, fenced on three sides and open at the front. A two-car garage is on the rear portion of the lot with a driveway from the street alongside the house leading to the garage. Officer Van Court had a search warrant for a search of the premises and no question is raised as to the validity or sufficiency of the warrant. The officers in two unmarked police cars arrived at the premises at about 3 p.m. As the officers approached the residence Officer Van Court saw defendant coming out of the kitchen door on the driveway side of the house. Defendant looked, saw the officers, including Sergeant Ross with whom he had had previous experience, and immediately turned and ran back into the house. The officers apparently knowing of defendant's propensity to escape custody acted accordingly. Officer Van Court ran to the rear of the house with Sergeant Ross. Sergeant Mullins ran to the front of the house. Officer Anthony, a few moments later, ran to the rear of the house. An entry into the house was made and as Officer Van Court came into the living room area Sergeant Mullins was presenting defendant with the search warrant of the premises. Upon request the defendant led the officers to his bedroom in the westerly part of the house and upon a search thereof the officers found a bag of balloons in a top dresser drawer. In the garage Officer Van Court discovered a large paper sack behind a picture frame between two vertical studs of the building. Upon opening the sack, Officer Van Court found a black plastic shaving kit container and within the kit bag there was a small green box which contained three razor blades and some pills, a small plastic sack containing a powdery substance (heroin), a large green box containing 1,000 empty gelatin capsules, 3 cellophane bags containing balloons and a large plastic sack containing 61 balloons, each balloon containing 10 capsules, and each capsule containing a grayish powdery substance (heroin). Also found in the kit bag were 10 marijuana cigarettes and some Zig-Zag cigarette papers. The respective powders or substances found in the respective containers were made up of about 20 to 30 percent pure heroin. Razor blades are frequently used by peddlers in capsuling heroin and in the mixing of heroin with milk sugar or other diluting substance. The heroin found in the plastic was sufficient to make between 115 and 120 capsules of heroin such as would be distributed by a peddler and would represent an amount in excess of $300 worth of narcotics as sold on the streets. The

capsules found in the garage were the type of gelatin capsules used for packaging heroin for sale. The balloons found in the cellophane package in the garage were identical to the balloons found in defendant's top dresser drawer in the bedroom. The 61 balloons, each containing 10 capsules of heroin (or 610 capsules) would be worth in excess of $1,800 if sold in the area to narcotics addicts.

Officer Van Court examined the arms of defendant for hypodermic needle marks and no evidence of such was found. The only occupants of the house were defendant and his elderly mother.

Defendant was placed under arrest upon the finding of the heroin and he was searched. Marijuana debris was found in his clothing.

By way of defense Joseph Vendrone testified that on January 21, 1966, between 5:30 and 6 a.m. he drove a car with James Harvey as a passenger to defendant's house and that as they pulled up in front of the house they saw a Jerry Trevich walk down the driveway of the premises, get into his car and drive off. On cross examination Vendrone stated, when asked to describe Trevich, "He is just a kid. He's got blond hair," he stated that he did not speak to Trevich on the occasion in question and that he did not tell the police about what he had observed because he was not asked the direct question. There was no explanation of how in the presumable darkness (6 a.m., January 1966) the witness was able to make out the features of a person in the presumably unlighted driveway. The witness also stated that he had no idea of the working hours of defendant but that he had dropped by his house between 5:30 and 6 a.m. to see if defendant could help him get a job.

Defendant's girl friend testified that on occasions she baby-sat for others at defendant's house and that some toys were kept at the house in the top dresser drawer, further, that about six months before the arrest in question, she and a girl friend were going to have a birthday party for a nephew and the friend had brought some balloons to defendant's house for the party but had forgotten and left them at the house.

Defendant testified that upon his release from the California Youth Authority, about November 27, 1964, he had worked as a cement contractor's helper and as a service station attendant, that while at the service station he saw Trevich whom he apparently disliked, because Trevich had testified against him in the matter which resulted in his com-

mitment to the Youth Authority December 20, 1963. (The record in that case (grand theft and escape) discloses that defendant pleaded guilty and there was no trial.) Defendant further testified that as he was coming out of the kitchen door of the house on the day of the search and arrest he saw Sergeant Ross, whom he had known through previous contacts with his arrest and plea of guilty to grand theft, that Sergeant Ross was with other men who defendant thought were police officers, that he then went back into the house and sat down in the living room, that he "figured they were coming to talk to me," that the officers entered and exhibited the search warrant and searched the premises. Defendant further stated that Sergeant Mullins showed him a bag of balloons and that Sergeant Mullins had stated that they were taken from the dresser drawer but that he (defendant) was "not sure" that there were any balloons in the dresser drawer.

After resting his case, defendant sought to have introduced into evidence a part of a record of a former case where Jerry Trevich was a witness for the prosecution. An objection was made upon the ground that what was sought to be introduced was hearsay and that there was nothing to show that the Jerry Trevich in the former case was the person referred to in this case. The judge sustained the objection and noted that the testimony in the record (with reference to Trevich's appearance at the house) was uncontradicted and the proposed evidence would be merely cumulative.

After the jury returned the verdict of guilty as charged, defendant applied for probation. Defendant advised the probation officer in the matter of his application, that he had started using "pills" and marijuana in 1961 and in 1962 had started to use heroin, that for a year prior to the time he was committed to the Youth Authority he had a heroin habit which required about a gram or ten capsules of heroin each day, that within one day after his release on parole from the Youth Authority, November 27, 1964, he was back to using heroin again and that up to the time of his arrest in the present case he was using a little over a gram of heroin per day. Defendant's counsel argued to the jury that defendant was not an addict or a user of heroin. Defendant further stated to the probation officer that about two weeks before the arrest he (defendant) had purchased two ounces of heroin for about $400 from which he had been selling before the arrest, that the sales were made for the purposes of getting money to maintain his own habit, that he "fixed" in his legs and feet

and not in his arms and therefore there were no marks on his arms; he requested that he be committed to the California Rehabilitation Center.

The police officers were of the belief that defendant was not a user, that defendant could exhibit no marks indicating any hypodermic injections and that had he been a user to the extent he asserted he would have been a "mainliner." The record discloses that no outfit for using heroin was found on defendant or on the premises and that defendant never pointed out where he had such an outfit.

At the time of the hearing on the application for probation, defendant's counsel urged that defendant be referred to "Department 95" for rehabilitation. The defendant stated in effect that he understood the circumstances, that he could be sent to prison if he came back to court for not cooperating with the California Rehabilitation Center authorities or otherwise. As heretofore indicated, the defendant, after about 30 days of being at the California Rehabilitation Center, escaped and was caught with the heroin in question several months later. The judge relying upon the defendant's request and statements, insofar as the record discloses, found defendant to be addicted or in imminent danger of becoming addicted and ordered the filing of the petition in Department 95 where based upon defendant's statements he was committed to the California Rehabilitation Center for treatment and rehabilitation.

The original file in this case also discloses that defendant told the officers at the California Rehabilitation Center that the week before he was arrested a friend of his was arrested, that the friend's wife came to defendant and wanted him (defendant) to purchase his "dope" that he had stashed away. Defendant further stated that he was using a gram per day at the time, that he agreed to and did buy the friend's "dope" and was to pay $50 per week for it, that the amount would take care of defendant's habit and he would not have to "hustle all the time," that he was arrested four days later and "kicked cold turkey in jail."

Appellant now asserts that the evidence is insufficient to support the judgment and that it was error to refuse to receive in evidence the other contents of the top dresser drawer.

Appellant makes no contention that the evidence is insufficient to show that the heroin in question was intended for sale.

It is appropriately stated in *People* v. *Redrick*, 55 Cal.2d 282, 287 [10 Cal.Rptr. 823, 359 P.2d 255]: "As might be expected, no sharp line can be drawn to distinguish the congeries of facts which will and that which will not constitute sufficient evidence of a defendant's knowledge of the presence of a narcotic in a place to which he had access, but not exclusive access, and over which he had some control, but not exclusive control." And, further, at pages 289-290: "The credence and ultimate weight to be given the evidence of the various particular circumstances are of course for the trier of fact, and 'It is the trier of fact, not the appellate court, that must be convinced of a defendant's guilt beyond a reasonable doubt. If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment.' [Citation.]

"The rule that 'to justify a conviction on circumstantial evidence the facts and circumstances must not only be entirely consistent with the theory of guilt but must be inconsistent with any other rational conclusion' [citations] is primarily for the guidance of the trier of fact. Such rule would be applicable to appellate review of a conviction only where, giving to each circumstance in evidence all the legal effect toward guilt which it could support, it would still appear that a rational conclusion of innocence was not excluded."

██ Some of the inferences from the evidence are that appellant had obtained a considerable quantity of heroin, had packaged it for sale and had hidden the heroin with some marijuana cigarettes in a kit in the garage; that appellant was not a user and had the heroin for sale; that appellant was nervous and frightened when he saw the policemen come to his house for he knew that they might find the heroin which he had hidden in the garage; that the marijuana in the garage was linked to appellant by the debris found in his clothing.

The trial judge commented to the jury upon the return of the verdict, "I don't think you could have reached any other verdict." We are persuaded that the evidence is amply sufficient to support the judgment.

Appellant attempts to argue here that inferences favorable to him should have been drawn from the evidence. At the trial, appellant's counsel did his best to make it appear that Trevich or someone else had placed the heroin in the garage for the sake of revenge or some other reason. The prosecutor

argued properly that the amount of heroin involved was far too large, if Trevich was involved in placing it in the garage in an attempt to frame appellant. To possess one small capsule of heroin is a felony and the prosecution questioned why Trevich would want to place about $3,000 worth of heroin in the garage for the purpose of framing appellant, when a single capsule would have been sufficient. Further, the prosecutor argued that Trevich would not have used appellant's garage as a place to store his heroin for the garage was only about 100 feet from the street and it was necessary to travel on the driveway past the windows of appellant's house to get from the street to the garage, and that he and appellant were supposed to be unfriendly to each other. In short, the jury and judge believed the prosecution witnesses and for the most part disbelieved the appellant and his witnesses.

██ Appellant's next contention is that the court should have received into evidence several items allegedly taken from appellant's residence by his girl friend. He desired to show apparently that certain razor blades of appellant's in the house were not the same as those found in the garage and that this would establish that the blades in the garage were not his. Further, he apparently felt that by showing that the girl friend had removed his belongongs from the top dresser drawer (after the arrest) he would bolster her credibility. The court properly commented in effect that up to that point there was no question with reference to the girl friend's credibility and refused the offer of the evidence. At most, the evidence would have been cumulative in nature for the witness had testified to the contents of the drawer and there was no effort or attempt to show that she had not correctly described the contents of the drawer. Furthermore, the finding of certain toys, and so forth, in the drawer in no way affect the finding of the balloons in the drawer. In any event, the charged error was inconsequential and was not prejudicial under the circumstances. (See *People* v. *Watson,* 46 Cal.2d 818 [299 P.2d 243].)

The judgment is affirmed.

Wood, P. J., and Lillie, J., concurred.

A petition for a rehearing was denied December 21, 1967, and appellant's petition for a hearing by the Supreme Court was denied January 31, 1968.